# IN THE COURT OF APPEALS OF IOWA

No. 21-0246
Filed October 20, 2021

**IN THE INTEREST OF N.E.,**
**Minor Child,**

**L.C., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Des Moines County, Jennifer S. Bailey, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Patrick C. Brau of Brau Law Office, Mount Pleasant, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Joshua Schier of Cray Law Firm, Burlington, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Vaitheswaran and Schumacher, JJ.

**BOWER, Chief Judge.**

A mother appeals the termination of her parental rights. We find clear and convincing evidence the child could not be returned to the mother's care and affirm.

### I. Background Facts & Proceedings.

N.E. was removed from the mother's custody shortly after birth in June 2019 and placed in emergency family foster care. At the time of removal, the mother, L.C., was on probation for two child-endangerment convictions, and her two older children had been removed from her custody and adjudicated children in need of assistance (CINA).[1] Her relationship with N.E.'s father, A.E., was marked by domestic violence, and he had pending criminal charges.

On June 25, the mother's probation was revoked upon a finding she committed a new child-endangerment offense—striking one of the older children with a belt—and she was sent to prison.[2] The parents stipulated N.E. was in need of assistance under Iowa Code section 232.2(6)(n) (2019) due to the mother's incarceration. However, the father denied allegations he was unable to parent the child safely. The court ordered the child placed in foster care pending an adjudicatory hearing.

---

[1] The child-endangerment offenses arose from the mother leaving the older children—who were six and seven years old—unattended in late 2017 and summer 2018. The children were adjudicated CINA and the mother participated in services. The CINA cases closed in January 2019.

The two older children were adjudicated CINA again following a new child-endangerment charge in March when the mother struck one of the children. The children were in the custody of their father, A.G., beginning in the summer of 2019, and the second CINA case was dismissed in February 2020 without the two older children returning to the mother.

[2] The mother's probation was revoked, but the criminal charges were dropped when A.G. refused to allow the children to testify.

Following an August 20 hearing, the court adjudicated the child CINA as stipulated by the parents and also under Iowa Code section 232.2(6)(c)(2) "by reason that the child was imminently likely to suffer harm as a result of the parents' lack of appropriate supervision of the child . . . and the father's mental capacity or condition or drug abuse results in the child not receiving adequate care." The child was placed in the custody of the maternal grandmother under the supervision of the department of human services (DHS).

While in prison, the mother obtained her GED, took a parenting class, and participated in all permitted visitation with the child. She was released from prison on March 3, 2020, and secured employment and housing.

On May 29, the court held a termination-of-parental-rights hearing. The court expressed concerns over the mother continuing to make excuses for her past conduct and failing to take responsibility for her past poor care of her children. The court also noted the grandmother and A.G. blamed "the courts and law enforcement" for the children's struggles and denied any fault on the mother's part. Although the court found clear and convincing evidence for termination of the mother's rights under Iowa Code section 232.116(1)(h), the court found termination was not then in the child's best interests "due to [DHS]'s support of adoption by family members who the court believes would simply return the child back to the birth mother," and the child's safety required continuing court oversight. The court utilized the permissive exception under section 232.116(3)(a) (child in the legal custody of a relative) to dismiss the petition to terminate the mother's rights. The court did terminate the father's parental rights.

The mother engaged in services. The child remained in the grandmother's care as the best placement for reunification. At a permanency hearing on June 30, both the mother and grandmother were "warned that any violation of the visitation rules would lead to immediate removal." The court ordered an additional six months of services and changed the permanency goal from adoption to reunification. The court ordered all visits "be fully supervised at this time by [DHS] or their designee." The court further ordered:

> That the child's mother, [L.C.], shall cooperate and participate with all services deemed appropriate by [DHS], including:
> • Abstain from the use of all illegal substances;
> • Submit to all drug testing requests;
> • Participate in [Family Safety, Risk, and Permanency] services, to include the Safe Care Program;
> • Maintain a safe and stable home;
> • Maintain employment;
> • Comply with all requirements of her parole and the Department of Correctional Services;
> • Participate in consistent and meaningful visitations with the child in the discretion of the [DHS];
> • Demonstrate an ability to safely parent the child and provide for all of [the child's] daily and long-term needs[.]

In late August, the court was informed the grandmother had allowed contact between the mother and child at a family birthday party without DHS approval or supervision. When the family's social worker asked the mother about it, she lied and said N.E. was not with her family at the birthday party.[3] The mother claimed the child had been left with a family friend for the day; the friend confirmed the story. The mother eventually admitted the unauthorized unsupervised visit when confronted with video evidence, and she later told her service provider she would

---

[3] The mother's presence at the party with her older children was also a violation of her probation, but no report of violation was filed.

do it again for her children.  There is no evidence the mother contacted any service providers to arrange supervision for the birthday party.

N.E. was removed from the grandmother's care and placed in family foster care.  The mother did not cooperate with the foster family.  She resisted changes in the child's care recommended by the child's doctor, including hearing and speech tests and a transition away from bottle feeding due to the child's age.  The mother resisted the child's placement in daycare while the foster parents worked, asking to take care of the child during those hours.

At a review hearing in early September, the court observed,

[The mother] is very good at completing services and checking boxes, but has previously failed at making good parenting decisions when she is in crisis. . . .  The court is concerned that it is only when no one else is looking that she exercises extreme and dangerous errors in judgment, which will not be shown while [the child] is removed and the court is looking over her shoulder.

A combined permanency and termination hearing was held in December. The DHS worker was asked what rules or other parts of court orders the mother has not followed since the birth of the child, and the worker identified the unauthorized visit in August.  The social worker explained the problem was not just the party, but the mother's decision to fabricate a story and involve others in deceit. She expressed concerns of the mother repeating earlier patterns.  The family-centered services (FCS) worker testified the child's removal from the grandmother appeared to serve as a wake-up call to the mother to pay attention to and follow the rules and she was contacting the worker more with questions she previously asked the grandmother.  The FCS worker had no concerns about the child being placed in the mother's care.

The court found the mother did not internalize the skills taught through services and was putting up a façade of appropriate parenting, which would disappear once court oversight ended. The court terminated the mother's parental rights under Iowa Code section 232.116(1)(h) (2020). The mother appeals.

**II. Standard of Review.**

"We review proceedings terminating parental rights de novo. We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re Z.P.*, 948 N.W.2d 518, 522–23 (Iowa 2020) (citation omitted). "The State must prove termination was proper by clear and convincing evidence." *In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021). "Evidence is considered clear and convincing when there are no serious or substantial doubts as to the correctness of conclusions of law drawn from the evidence." *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016) (edited for readability).

**III. Analysis.**

To terminate the mother's rights under Iowa Code section 232.116(1)(h), the State must prove all of the following:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

On appeal, the mother claims the State failed to prove by clear and convincing evidence the fourth element—the child could not be returned to her care at the time of the termination hearing.[4]

The DHS worker agreed the mother had generally been successful at meeting progress goals but worried the mother would return to her old behaviors. The DHS worker acknowledged the visitation violation was the only known juvenile court order violation the mother had since the child was born. The FCS worker who supervised the visits and worked on parenting skills with the mother on a regular basis believed the mother had internalized the parenting skills, and the worker did not have concerns regarding her care. The FCS worker testified "it would be detrimental at this point to have built a bond and then snatch it away."

In its termination order, the juvenile court observed the mother "has done virtually everything the court has asked her to, with the exception of the visitation issue. . . . [The mother] has successfully checked virtually all of the boxes the court has asked her to." But the court then noted the mother also knew she should not leave her young children alone or "whoop" one with a belt, which had resulted in three child-endangerment charges, "but did so anyway." The court then opined it did not believe the mother would use the skills she had learned "in light of her unauthorized contact with [the child] and her current lack of cooperation with [DHS]." The court found the mother would likely repeat the same mistakes leading

---

[4] The mother cites Iowa Code section 232.116(2) rather than paragraph 232.116(1)(h) as the subsection her rights were terminated under, but her argument is sufficiently clear for purposes of the appeal.

to her older children's removal, and the child is at vulnerable age and unable to self-protect.

While the mother has made progress, we share the court's concerns. The juvenile court specifically found the mother's testimony was "disingenuous." We accord special weight to the juvenile court's findings of witness credibility because it has a better opportunity to view and assess the witnesses. *See M.W.*, 876 N.W.2d at 219. Moreover, "[w]e gain insight into the child's prospects by reviewing evidence of the parent's past performance—for it may be indicative of the parent's future capabilities." *In re M.S.*, 519 N.W.2d 398, 400 (Iowa 1994). At the June 30, 2020 permanency hearing—less than a month after dismissing the first termination petition—the juvenile court changed the permanency goal back to reunification, but it ordered no contact between the mother and child was to occur outside supervised visitation, and the court specifically warned the mother and grandmother "any violation of the visitation rules would lead to immediate removal." In August, despite the recent termination petition and direct order regarding visitation, the mother knowingly had unsupervised contact with the child in public and then asked her friend to lie about it. She did not admit violating the order until confronted with video evidence and later stated she would "do it again." The mother lied to service providers and the court multiple times and valued her own opinions over the direction of the court and the child's doctor as to the child's best interests.

Considering all the facts, we find clear and convincing evidence the child could not be safely returned to the mother's care at the time of the termination hearing. We affirm the termination of her parental rights.

**AFFIRMED.**

Vaitheswaran, J., concurs; Schumacher, J., concurs specially.

**SCHUMACHER, Judge** (concurring specially).

I would also affirm the decision of the district court. I write separately from the majority to emphasize additional facts in this record that support the trial court and the majority's determination that N.E., age eighteen months at the time of the hearing on the State's termination petition, could not safely be returned to his mother's custody.

The mother was charged with three separate incidents of child endangerment related to her two young daughters. The mother has been involved with DHS since late 2017, when her two daughters were removed from her care due to the first child-endangerment charge. She was convicted of child endangerment on January 5, 2018. The mother was placed on probation, and the children were returned to her care. The second charge occurred on June 1, 2018, less than a month after her daughters were returned to her care. The children were again removed. She was sentenced on the second conviction on September 27, but remained on probation. The children were again returned to her care in November 2018, and the juvenile case was closed on January 8, 2019. Thirty-eight days after case closure, the mother received her third child-endangerment charge. She was sentenced on a probation violation on June 25, 2019, and sent to prison. This sentence was imposed approximately three weeks after N.E.'s birth.

The third charge, filed after one of the girls reported to her teacher that her mother "whooped" her, was dismissed after the child's father, with whom the reporting child now resides, refused to allow the child to return to Iowa to testify.

The two girls were placed with their father in Chicago, Illinois, by DHS after he passed a home study.

The mother was released from prison in March 2020.[5]  On appeal, the mother argues the only violation she committed after her release from prison was arranging and attending an unauthorized visit in late August 2020.  She denied such until confronted with video evidence.  However, the record contradicts the mother's minimization of rule violations.  She admits a requirement of her parole was that she have no contact with the victims of her offenses—her two daughters.  The record is clear the mother had contact with the girls prior to her release from parole.  Both the mother and the father of the girls testified at the time of N.E.'s termination hearing that they intend to renew their relationship, with the mother moving to Chicago.[6]

The home study for the girls' father also confirms his denial of the mother's abuse.  He does not believe the mother committed the abuse and deflects the blame away from the mother with whom he envisions a long-term relationship.  Could N.E.'s safety be assured if placed with his mother?  This record answers in

---

[5] Her parole supervision was terminated in September 2020.

[6] The mother admitted to these additional violations on cross-examination:

> Q: So earlier when you testified that you had followed all the rules of parole and there were not violations, that's not accurate, is it?  A: No.  I was meaning in my—in keeping my job, keeping my house, making sure I was keeping myself clean.
> Q: But you were mostly following parole is that what you were testifying to?  A. Yes, ma'am.

The mother later added:

> Q: So other than violating this court's order, lying about it, getting somebody to lie for you and violating your parole, you were open and honest?  A: No.  No.  Those are the things I did not tell the truth on.

the negative. The mother was imprisoned for the first nine months of N.E.'s life. He has been out of her custody for eighteen months—his entire life. He is too young to self-protect. The mother's anticipated residence with a person who has expressed disbelief of the mother's prior abuse of his own children cannot guarantee the safety of this young child.

The Iowa Court of Appeals has previously stated:

> We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*In re C.M.W.*, 503 N.W.2d 874, 875 (Iowa Ct. App.1993).

Given the series of acts of abuse, the violation of the condition of parole, the violation of the court order noted by the majority, the mother's proposed move to the home of her daughters' father, and the mother's unwillingness or inability to internalize change, the elements of Iowa Code section 232.116(1)(h) are supported by clear and convincing evidence.